**Kenneth E. GUIER, Appellant,**

v.

**Marcia A. GUIER, Respondent,**

**Guardian Ad Litem, Respondent.**

**No. WD 51670.**

Missouri Court of Appeals,
Western District.

April 2, 1996.

Bruce A. Bailey, Warrensburg, for appellant.

James A. Rahm, Carrollton, for respondent Marcia Guier.

Edward B. McInteer, Marshall, guardian ad litem.

Before FENNER, C.J., P.J., and LOWENSTEIN and SMART, JJ.

FENNER, Chief Judge.

Kenneth E. Guier ("Father") appeals from the trial court's order denying his motion seeking a modification of a dissolution of marriage judgment regarding the custody of minor children born to his marriage with respondent, Marcia A. Guier ("Mother"). Father claims that the trial court erred by applying the wrong standard of review in denying his motion for modification of child custody, in determining that Father had not proved by a preponderance of the evidence that there had been a chance of circumstances and that modification was not necessary to serve the best interests of the child, in overruling Father's motion to remove the guardian ad litem, in failing to require the guardian ad litem to make a recommendation to the court on the issues involving the children, and in granting judgment against Father in the amount of $3,580.00 to pay the guardian ad litem and counselor's fees.

The facts presented to the court by the parties are considerable and typical of a marital dissolution proceeding filled with animosity. We recite the pertinent facts with as much brevity as possible.

The marriage of Father and Mother ended in a decree of dissolution on July 8, 1991. Joint legal custody of the two minor children, Karla Ann Guier ("Karla") and Robert Lee Guier ("Bobby") was granted to the parties with Mother receiving primary physical custody subject to Father's right of reasonable and specific visitation. Edward B. McInteer served as the guardian ad litem in the dissolution proceeding.

Father filed an amended motion for modification on November 30, 1994, seeking a change of custody and alleging physical and emotional abuse by Mother, failure to obtain counseling for the children, failure to obtain proper medical care for Bobby, and alienation of the parent-child relationship in violation of the joint legal custody order. McInteer was again appointed as the guardian ad litem for the children.

At the trial of Father's motion to modify, Mother was called as his first witness. Mother testified that after the dissolution,

she moved to Cainsville, Missouri, to teach in the school district there. While in Cainsville, Bobby was involved in an incident at school which Father terms "aggressive" conduct. Mother states that Bobby's teacher mentioned he was playing too rough with some of the children on the playground, she spoke to him, and Bobby's behavior improved. Mother stated that incidents of this type behavior were usually more pronounced after Bobby returned from visiting his father, but that his behavior improved after Father had a talk with him.

Mother also testified that Bobby had a problem wetting the bed after the divorce, but denied that Bobby had a problem wetting his pants or defecating in his clothing immediately after the divorce as alleged by Father. Mother testified that the problem with defecating in his clothing arose in September of 1994. Father alleged that Mother punished Bobby for soiling his pants by spanking him, hitting him with a fly swatter, and striking him with a belt hard enough that she checked to see if she had left marks on his buttocks. Mother admitted that she sometimes had a problem with anger, had spanked Bobby and struck him with a fly swatter when he had jeans on, but denied striking him with a belt hard enough to leave welts.

Father and Father's current wife testified as to conversations with Karla in 1992 in which Karla said that Mother spanked her so hard that she had welts on her legs that they had to put cream on and that she had to wear long pants to school until the welts disappeared. This incident was denied by Mother. Karla also reportedly said that Mother had slapped her on occasion since the divorce and that Mother had pulled her hair after a misunderstanding with Karla. Mother denies pulling Karla's hair, but cannot recall if she ever slapped Karla. The maternal grandmother of the children testified that both children told her that Father spanks them—Bobby for wetting or soiling the bed or his pants and Karla for not sleeping in her own bed. Father denies spanking the children.

Father's case also included allegations that Mother had called Karla an "idiot," Bobby a "shit," and that she had cursed Father in front of the children. Mother admitted that there was one telephone conversation in which she had cursed Father over the phone and stated that Father had cussed her in front of the children as well. Mother also admitted to making other derogatory statements about Father in front of the children. When Mother asks the children about what Father says about her, she states that they "clam up" and act like they are afraid to talk.

Both parents also testified as to Bobby's ear problem and a dispute over the provision of custom ear plugs for Bobby's summer visitation with Father in 1993. Bobby was to take part in a swimming program and he needed ear plugs in order to avoid illness or damage to his ears from swimming. Mother had ordered custom ear plugs and had not received them at the time custody was transferred for the summer, but stated she would send them when she received them. Mother received the custom plugs in mid-June, but did not send them to Father. Father blames this failure for the problems Bobby experienced with his ears later that summer. Mother claims she was unable to send the ear plugs because after visiting her parents one weekend, she was unable to return to her home in Cainsville because of the severe flooding the area experienced during the summer of 1993. Mother was also attending summer school in Maryville, Missouri that summer and was unable to return home during part of that period. Mother testified that Father was well aware of Bobby's condition and that it would have been easier for him to go to Liberty, Missouri, and have another set made than for her to return to Cainsville given the conditions.

Father also complains of an incident where a small amount of blood appeared on Bobby's pillow one morning. Father complains because Bobby did not immediately see a doctor. Mother responded that the blood on the pillow was a tiny drop, she did not see the blood until Bobby's teacher pointed out some dried blood on his ear to her at lunch that day, and even then it looked as if he had scratched his ear. She took no action because Bobby had an appointment already scheduled with the doctor the next day. The

doctor's diagnosis was that of a broken blood vessel in the ear and it was of no great concern to him.

Father also points to alleged disciplinary problems involving Karla as a "change of circumstances" providing grounds for a modification of custody. Father claims that Karla experienced disciplinary problems in school while in Cainsville and that her teacher reported that she spent a lot of time "day dreaming in her own little world." Karla was sent to the principal's office twice while at Cainsville, though on one of these occasions the principal was helping Karla with an assignment she was having trouble with or that she and the teacher did not agree about.

The testimony also revealed that both parties took the children to counselors without advising the other until after the fact. Father took Karla to Dr. Kitto after her alleged disciplinary problems at school in Cainsville. Father told Mother Karla had been diagnosed with Attention Deficit Disorder ("ADD") by Dr. Kitto after she confronted him with a bill she received from the doctor's office. Father assured Mother he would have the records confirming the diagnosis sent to her, but never did. Mother did not tell Karla's teacher of the diagnosis because she questioned the truth of Father's statements. After Father met with Karla's teacher and told her of the diagnosis, the school acquired the records confirming the diagnosis.

Mother took Karla to Mr. Roger Bryan in 1992. Mr. Bryan advised Mother that Karla was suffering from separation anxiety and depression. Mother did not follow up with further counseling as recommended by Mr. Bryan because of her work schedule and a fear of losing her job if the school found out about the counseling.

After one year in Cainsville, Mother moved with the children to Bosworth, Missouri. Karla's teacher at the time of trial testified that Karla did not exhibit any symptoms to her of ADD and that Karla was the top student in her class and definitely not a behavior problem. Karla had been named student of the month for April (an achievement overshadowed by Father and Mother's debate over why Father wasn't told of the

honor by Mother, who assumed Karla had told him). Bobby's teacher testified that he was a normal, average kid with slightly above average scholastic abilities. The only time she noticed any problem with Bobby's behavior was near a previous hearing date, but that after the hearing date was canceled he was a different child.

In addition to allegations directly involving the children, the evidence reveals several other incidents involving Father and Mother since the initial dissolution that illustrate their continuing inability to effectively communicate. Father claims that Mother, when upset with his actions, would threaten him with the withdrawal of visitation rights. During a conversation after Mother moved to Cainsville, some 128 miles from Father's residence, Father requested that Mother meet him half-way for the weekend visitation exchanges and received the response that it was "[his] problem, that [he] had started this mess, and that [he] would just have to live with it."

Father also complains of difficulty obtaining information from Mother concerning the extracurricular activities of the children. On one occasion, he requested a list of game dates and practices for a team of which Karla was a member. Mother agreed to send him the list, but after not receiving it within a little less than two weeks, he called the school and obtained a list. Mother states that she provided Father with a list at the next visitation exchange, only to learn from her principal that he had called to get the list earlier in the week before the exchange.

A dispute also arose over bicycles that Father purchased for the children for Christmas in 1993. They were allegedly purchased on the condition that the children could take them back to Cainsville as long as they were returned to Father's residence in accordance with the children's summer visitation. At the time of the summer visitation exchange, a mix-up arose over where the children were to be picked up—in Cainsville or in Carrollton, where Mother's parents resided. After first going to Cainsville and finding that Mother and the children were not there, Father went to Carrollton to pick up the children. In

addition to the dispute about what was said about where to pick up the children, the bicycles were in Cainsville. Mother allegedly told Father that "he made enough money he could buy new ones" and ordered him off the property.

Yet another dispute arose when Father unexpectedly showed up at Mother's home in Cainsville one winter Tuesday evening to tell the children about his engagement to his present wife. Father refused to tell Mother why he was there until he spoke to the children and requested that he be able to take them out for ice cream. The nearest town where he could take them for ice cream was fifteen miles away, it was very cold and Bobby was prone to ear infections, and it was a school night, so Mother refused to let the children leave. Father insisted on speaking to the children in private, and Mother offered to go to another part of the house while he spoke to them. This was not sufficient for Father, who instead took the children out to his car to talk to them about his impending nuptials.

The guardian ad litem was able to meet with the children and discuss the situation with them outside the presence of either parent. During this visit, Karla apparently told Mr. McInteer that she wanted to live with Father, according to the testimony of Mother. According to Father, Karla emerged from her visit with Mr. McInteer in tears, leading Father to conclude that Mr. McInteer had been "rough on her" when questioning her. Mother also testified that Karla later changed her mind about living with Father, stating that "she didn't want to stay with dad."

Additional events and testimony are related in the nearly 50 pages of facts recited by the parties in their briefs that indicate the continuing acrimonious relationship between the parties and the flavor of their arguments to this court. We believe the above recitation includes the relevant facts sufficient to dispose of this appeal.

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicat-

## I. STANDARD OF REVIEW

The applicable standard of review requires that this court affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Humphrey v. Humphrey*, 888 S.W.2d 342, 345 (Mo.App.1994). When there is conflicting evidence, the trial court has the discretion to determine the credibility of the witnesses, accepting or rejecting all, part, or none of the testimony it hears. *Sanders v. Sanders*, 770 S.W.2d 523, 524 (Mo.App.1989); *Ware v. Ware*, 647 S.W.2d 582, 584 (Mo.App. 1983).

Because the trial court is in the best position to weigh all the evidence and render a judgment based on the evidence, the judgment is to be affirmed under any reasonable theory supported by the evidence. *Ware*, 647 S.W.2d at 584. A great deal of caution should be exercised in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence, and only then upon a firm belief that the judgment of the trial court was incorrect. *V.L.P. v. J.M.T.*, 891 S.W.2d 577, 579 (Mo.App.1995). In child custody matters the trial court's determination must be given greater deference than in other cases. *Humphrey*, 888 S.W.2d at 345.

## II. STANDARD FOR MODIFICATION APPLIED BY THE TRIAL COURT

The standard that a trial court must apply in deciding whether to modify a prior custody decree is set forth at section 452.410.1, RSMo 1994,[1] and states:

Except as provided in subsection 2 of this section, the court shall not modify a prior custody decree unless it has jurisdiction under the provisions of section 452.450 and it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custo-

ed.

dian and that the modification is necessary to serve the *best interests of the child.* Appellant contends that the trial court applied the wrong standard in refusing to modify the prior custody decree when it stated in its Order dated August 11, 1995, that "the evidence and testimony adduced at trial wholly fail to demonstrate changed circumstances so substantial and continuing as to make unreasonable the child support and custody provisions" set forth in the earlier decree.

▮ Appellant recognizes and we acknowledge that the standard announced by the trial court is applicable to a request for modification of child support, a request that was made by the Mother as part of the underlying action. A change in circumstances, however, is also a precursor to a finding that the best interests of the child necessitate a modification of a prior custody decree based on the language of 452.410.1. *See Wilson v. Wilson,* 873 S.W.2d 667, 670 (Mo.App.1994). If the evidence and testimony "wholly fail to demonstrate changed circumstances ... to make unreasonable the child ... custody provisions," there can be no change in circumstances on which to base a modification of custody in the best interests of the child.

The trial court heard testimony for two days, ordered both parties to undergo counseling during a two month continuance, interviewed the children in chambers, and heard testimony from the mental health providers that the parties and children visited during the continuance. In reaching its decision, it is clear that the trial court weighed the applicable factors and considered the best interests of the child in finding that there was no change of circumstances to justify a modification.

▮ This holding is consistent with the principle applied in our courts that children should not be moved from one environment to another upon slight changes of status of the parents. *Humphrey,* 888 S.W.2d at 345; *Clark v. Clark,* 805 S.W.2d 290, 295 (Mo.App. 1991). A change will be made only where the welfare of the child requires that custody should be transferred. *Id.* The trial court did not apply the incorrect standard of review or erroneously apply the law in reaching its decision denying a modification of custody. Point denied.

## III. SUFFICIENCY OF THE EVIDENCE

▮ Father contends that the trial court erred in finding there were no changed circumstances to support his argument that the best interests of the children required a modification of custody. Once custody has been originally adjudicated, a presumption arises that the custodial parent remains suitable. *Humphrey,* 888 S.W.2d at 345; *Wilson,* 873 S.W.2d at 670. The burden of showing circumstances which warrant a change of custody is on the moving party. *Id.* The change of circumstances must be of a nature that the child will substantially benefit from the transfer of custody. *V.L.P.,* 891 S.W.2d at 580.

▮ Section 452.375.2 sets forth the relevant factors which shall be considered by the court in a determination of custody in accordance with the best interests of the children. These factors are also applicable to the determination of a motion to modify custody. *Id.* These factors include:

(1) The wishes of the parents as to custody;

(2) The wishes of a child as to his or her custodian;

(3) Interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to home, school, and community;

(5) Mental and physical health of all individuals involved, including any history of abuse of any individuals involved;

(6) Needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) Intention of either parent to relocate their residence outside of the state; and

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

Father contends that an evaluation of these factors revealed that Mother was physically abusive to the children, failed to obtain recommended counseling for Karla, attempted to alienate the children from him, failed to provide proper health care for Bobby's ear condition, had problems disciplining the children, violated the joint legal custody plan, and that Karla expressed her wish to live with him. Having reviewed the record, we believe the evidence as to these contentions is conflicting at best, and given that the trial court has discretion in determining the credibility of witnesses, Father could not satisfy his burden of showing a change of circumstances which warranted a change of custody in the best interests of the child.

■■■ The alleged abuse Father refers to was testified to by himself and his current wife based on hearsay statements allegedly made by the children to a counselor they visited without Mother's knowledge. The alleged abuse was denied by Mother and her witnesses, though Mother did admit to spanking the children and could not remember whether she ever slapped Karla. Father apparently equates the use of corporal punishment to abuse and states that he never spanked the children. This statement was contradicted by testimony from the maternal grandmother that the children told her that Father spanked them. This flurry of allegations is illustrative of a lack of communication between both parties as to the proper disciplining of the children, not child abuse. Though proof of child abuse is a sufficient change in circumstances to justify a change in custody, *Schaffer v. Haynes*, 847 S.W.2d 814, 823 (Mo.App.1992), there is simply not sufficient evidence to support Father's allegation that Mother physically abused the children.

■■■ Verbal abuse of children can also be grounds for modification of custody. *Johnson v. Johnson*, 758 S.W.2d 721, 725 (Mo. App.1988). The evidence on this issue is also conflicting at best. Father claims that the children told him that Mother called Bobby a "shit" and Karla an "idiot," but Mother denies such allegations. Whether to believe the testimony of either party was a matter of discretion left to the trial court.

The trial court clearly considered the counseling issue in reaching its conclusion. The counselor that Mother took the children to see recommended further counseling for Karla which was never obtained, and the trial judge stated that "I do hold [Mother] responsible for not getting the counseling when it was established and set up and recommended" when he required counseling during the continuance of the motion proceedings. This factor, however, must be evaluated in conjunction with the other factors in determining whether the children would substantially benefit from a custody change.

With regard to derogatory comments made by Mother about or to Father in the presence of the children, there is no dispute that some such comments were made. Father cites *Gentry v. Simmons*, 754 S.W.2d 579, 582 (Mo.App.1988), for the proposition that when a parent who has custody makes disrespectful and abusive statements against the other parent and attempts to wean the children away from the noncustodial parent, the decree can properly be modified and the custody changed. The evidence in the record does not reveal the persistent, extreme measures to alienate the children from the father that were present in *Gentry*. The comments in question, tragically, are common in actions such as this that involve a bitter marital dissolution, but do not demonstrate a persistent effort to alienate the children from Father.

■■■ A parent's failure to provide proper medical care can also equate to a change of circumstances sufficient to justify custody modification. *Johnson*, 758 S.W.2d at 725. In claiming that Mother failed to provide proper medical care for the children, Father points to the incidents involving the failure to send the ear plugs for Bobby during the summer and waiting a day to take Bobby to the doctor after a small amount of blood from his ear was noticed on his pillow. With regard to the ear plugs, Father could just as easily have prevented any resulting illness by not allowing Bobby to swim or by procuring

an additional set of ear plugs himself. With regard to the ear bleeding, Bobby saw the doctor at a regularly scheduled appointment the next day who confirmed the problem to be minor. Mother has not neglected to provide medical care for the children.

■ The evidence as to Karla's custodial preference is also conflicting. She allegedly told Mr. McInteer, the guardian ad litem, that she wanted to live with her father, then reportedly changed her mind according to the mother's testimony. The decision whether to ascertain such wishes through an interview of the child in chambers is discretionary with the trial court. *Osmun v. Osmun,* 842 S.W.2d 932, 936 (Mo.App.1992). The court interviewed Karla and Bobby in chambers, but did not question them as to who they wished to live with. If the court does not elect to question the children on the issue, then the statute has not application. *Id.; Duncan v. Duncan,* 528 S.W.2d 806, 809 (Mo.App.1975). Given these circumstances, this factor is negligible in the court's determination of the best interests of the child.

Father points to a change in the children's behavior illustrated by problems at school as evidence that changed circumstances exist and custody should be modified. The evidence in the record indicated only minimal difficulties in school in the year after the divorce. The testimony of the children's teachers at the hearing was that they were normal kids who were doing well in school. Though there was an incident where Bobby was reprimanded for playing too roughly on the playground, there is no continuing pattern of misbehavior. Further, most problems that Bobby did have appeared linked to hearing dates in the divorce proceedings according to his teacher, a problem attributable to both parents.

Finally, Father claims there is a change of circumstances requiring a custody modifica-tion in the best interests of the child because Mother has violated the joint legal custody plan. This argument would be more convincing if Father were not equally guilty of violating the joint legal custody plan. Father and Mother both took the children to counselors without telling the other. Together, they have failed to discuss the children's religious upbringing and the mode of discipline to be utilized for the children. Both Father and Mother have demonstrated a continuing inability to abide by the joint legal custody agreement.

Based on the above analysis, it is clear that the trial court did not err in concluding that Father did not establish that a change of circumstances existed of a nature that the best interests of the children required a transfer of custody. We believe the guardian ad litem accurately summed up the situation in his brief, stating that most of the conduct, or lack thereof, exhibited by the evidence is typical of a dispute such as this when both parties fail to realize that what their children need are for them to put their differences behind them and get on with the business of parenting. There was ample evidence to support the trial court's judgment. Point denied.

## IV. *FATHER'S MOTION TO REMOVE THE GUARDIAN AD LITEM*

Prior to the hearing on Father's motion to modify, he filed a motion to remove the guardian ad litem, alleging that the guardian was biased and prejudiced against him, that the guardian failed to conduct any interviews with the appellant or his present wife in violation of section 452.423.2(2),[2] and that the guardian was not qualified under section 210.160.6 [3] to serve as the guardian. Father's motion was denied by the trial court after a hearing on April 20, 1995.

**2.** Section 452.423.2(2) provides:
The guardian ad litem shall ... [p]rior to the hearing, conduct all necessary interviews with persons having contact with or knowledge of the child in order to ascertain the child's wishes, feelings, attachments and attitudes. If appropriate, the child should be interviewed.

**3.** Section 210.160.6 provides:

Any person appointed to perform guardian ad litem duties shall have completed a training program in permanency planning. A nonattorney volunteer advocate shall have access to a court appointed attorney guardian ad litem should the circumstances of the particular case so require.

The duty of a guardian ad litem is to protect the best interests of a child. *State ex rel. Bird v. Weinstock,* 864 S.W.2d 376, 385 (Mo.App.1993). It is the guardian ad litem's duty to stand in the shoes of the child and weigh the factors as the child would weigh them if his judgment were mature and he was not of tender years. *Id.* Removal of a guardian ad litem is a matter vested in the sound discretion of the appointing court. *Id.* at 381.

Father's contention that the guardian was biased and prejudiced is unfounded. Father points to several comments made by the guardian to Father's attorney, including that Father was "aggressive," that "he wants his own way," that Father "didn't have respect for [the guardian's] position" and that "[Father] has a lot of problems, too," as evidence of the guardian's bias and prejudice along with a few other minor incidents. The guardian's principal allegiance is to the court and his function is to advocate what he believes to be the best interests of the children. *See Id.* at 385. Obviously, this will likely be contrary to the position taken by one of the parents, in this case the Father. Father's complaints boil down to the fact that he was upset because the guardian did not necessarily agree with Father's positions. The trial court did not err in refusing to remove the guardian based on Father's allegations of bias and prejudice.

As to whether the guardian ad litem conducted all necessary interviews to protect the best interests of the children, it is the express mandate of section 452.423.3 that the trial judge monitor the guardian's performance of his duties and discharge him if he fails to perform them diligently. *Weinstock,* 864 S.W.2d at 385. The guardian ad litem for the Guier children in the modification was the same guardian ad litem who served as their representative in the initial dissolution proceeding. He had a baseline familiarity with the family that would alleviate the need to do some of the basic background investigation required of a newly appointed guardian ad litem. After his reappointment in the modification proceeding, he participated in witness depositions, met with the children, and interviewed persons having contact or knowledge with the children as part of his investigation. Such evidence indicates that the guardian ad litem was diligent in the performance of his duties.

Father points to the fact that the guardian ad litem did not interview him or his current wife as evidence that the guardian did not exercise due diligence in carrying out his duties. Again, the guardian was familiar with Father prior to his reappointment in the modification proceeding. Further, if Father felt it was necessary to meet with the guardian, he could have contacted him and set up a meeting himself. Father admits that he initiated no contact with the guardian ad litem. The trial court did not err in determining that the guardian ad litem conducted a sufficient investigation to establish the best interests of the children.

Finally, Father contends that the trial court erred in overruling his motion to remove the guardian ad litem because he had not participated in a permanency planning program pursuant to section 210.160.6. It cannot be disputed that the proceedings in question were filed pursuant to section 452.410 and that the guardian in this matter was appointed pursuant to section 452.423.1, which states:

> In all proceedings for child custody or for dissolution of marriage or legal separation where custody, visitation, or support of a child is a contested issue, the court may appoint a guardian ad litem. The court shall appoint a guardian ad litem in any proceeding in which child abuse or neglect is alleged.

This provision is within the dissolution of marriage, divorce, alimony and separate maintenance chapter of our statutes and the motion for modification of custody constitutes a post-dissolution domestic proceeding encompassed by this chapter.

Father correctly points out that a portion of section 210.160.1 mirrors the last sentence of section 452.423.1, stating:

> In every case involving an abused or neglected child which results in a judicial proceeding, the judge shall appoint a guardian ad litem to appear for and represent:

(1) A child who is the subject of ... proceedings to determine custody or visitation rights under sections 452.375 to 452.410

. . . .

This provision, however, is contained within the child protection and reformation chapter of our statutes and, as it applies to Chapter 452 proceedings, appears to merely be an affirmation of the provision for appointment of a guardian ad litem found in that chapter. Though there was an allegation of abuse made by Father, the provisions of Chapter 210 regarding child protection and reformation were not implicated by the proceedings. The Guier children were never subject to child protective services and were never wards of the Department of Family Services.

 It is our belief that section 210.160.6, requiring permanency planning training for anyone appointed as a guardian ad litem, does not apply to guardian ad litem's appointed pursuant to Chapter 452 unless child protective services are required and the provisions of Chapter 210 are implicated.[4] Section 452.423 sets forth the duties and requirements of a guardian ad litem appointed pursuant to a dissolution or custody proceeding. If the legislature intended for these guardians to satisfy a permanency planning program in this setting, then a provision would be included in this statutory chapter as well.

It should also be noted that even if we determined that section 210.160.6 was applicable to the guardian ad litem in this case, Father's argument would fail. Counsel for all parties agreed prior to trial that if a representative of the Division of Family Services were to testify, he would state that no such permanency planning training was to be offered by any state agency until September 1995, months after the hearing on Father's motion to modify. The lack of training complained of by Father was not even available to the guardian ad litem at the time of trial and Father was aware of this fact.

Father's argument's that the trial court abused its discretion or erroneously applied the law in denying his motion to remove the guardian ad litem are without merit. Point denied.

## V. *ABSENCE OF EXPLICIT RECOMMENDATIONS FROM THE GUARDIAN AD LITEM*

 Father next claims that the trial court erroneously applied the law when it failed to require the guardian ad litem to make a recommendation to the court on the issues affecting the children. Because Father did not object to this alleged error at trial, he asks that we review his argument under the plain error doctrine. Even though an issue was not raised or preserved at the trial court, the plain error doctrine allows this court, at its discretion, to consider a plain error affecting substantial rights if we determine that manifest injustice or a miscarriage of justice would otherwise result. *D.D.C. v. B.C.*, 817 S.W.2d 940, 944 (Mo.App. 1991).

 In support of his position, Father cites *In Interest of J.L.H.*, 647 S.W.2d 852 (Mo.App.1983), and states:

> Even though the court would not be bound by the opinion or recommendation of the guardian ad litem, *Brooks v. Division of Children's Services*, 411 S.W.2d 276, 282 (Mo.App.1967), it is imperative that the guardian ad litem investigate and have input on the perspective of the child's best interest and this be presented to the trial judge.

*J.L.H.*, 647 S.W.2d at 860–61. Father interprets this language to require the guardian ad litem to make a formal, explicit recom-

---

**4.** The provision in Chapter 210 deals with issues of custody that arise pursuant to proceedings in the Juvenile Court concerned with the care and protection of children that allegedly been abused or neglected by their parents or caretakers. In many cases, these children are removed from the custody of their parents and placed in foster care. The need for permanency planning is obvious in these cases, where someone acting as a guardian ad litem would need to know all the community resources that are available for the child as well as seeing to it that those services are provided and that the reunification of the child with its parents remains the goal of the State. These concerns are not present in a Chapter 452 proceeding where child protective services are not implicated even though the guardian may be performing other similar duties.

mendation to the trial court. We do not believe such an explicit recommendation is required.

In *J.L.H.*, the court was concerned with the inactivity of the guardian ad litem in his representation of the minor child, stating that "[f]rom the transcript here it is difficult to see what the guardian ad litem contributed to determining what here was best for J.L.H." *Id.* at 860. In the case at bar, we are not presented with an inactive guardian ad litem despite Father's arguments to the contrary. The guardian ad litem in this case was very active in cross-examining witness, especially Father, Mother, and the counselors for the parents and children, took part in pre-hearing depositions, and recommended that the court interview the Karla and Bobby in chambers after the close of the second day of evidence as a result of some of the evidence elicited during testimony. He performed an adequate pre-hearing investigation of the facts and circumstances surrounding the motion to modify, as discussed in the preceding section of this opinion. The guardian had input and perspective on the best interests of the Guier children and we believe he conveyed such to the trial judge through his active participation in the modification proceedings.

The trial court did not erroneously apply the law in failing to require an explicit recommendation from the guardian ad litem as to the best interests of the Guier children. Such an explicit recitation is not required by statute or case law. The guardian ad litem conducted a sufficient investigation and provided input and perspective as to the children's best interests, which satisfies the requirements of the law. Point denied.

## VI. *PAYMENT OF GUARDIAN AD LITEM AND COUNSELOR'S FEES*

In the Order denying Father's motion for modification, the court entered a judgment against Father in the amount of $3,580.00 in favor of the guardian ad litem, with the provision that the guardian was to pay the fees of Mr. Millard Mann, one of the counselors, from the judgment. Father claims that the award was made in error because such an award violates section 210.160.4, which states:

> The guardian ad litem may be awarded a reasonable fee for such services to be set by the court. The court, in its discretion, may award such fees as a judgment to be paid by any party to the proceedings, or may tax said fees as costs to be paid by the party against whom costs are taxed, or from public funds. However, no fees as a judgment shall be taxed against a party or parties who have not been found to have abused or neglected a child or children.

Father contends that because there were no allegations or findings that he abused the children, the award against him is improper.

Father's contention is again based on a misapplication of the provisions of Chapter 210 to this proceeding. Though, as we stated earlier, section 210.160.1 is in harmony with section 452.423.1 as to the appointment of the guardian ad litem, we do not believe the remaining provisions of section 210.160 are applicable to guardian's ad litem appointed pursuant to section 452.423 unless the child or children are subject to child protective services or DFS custody.[5]

Section 452.423.4 provides for the payment of guardian ad litem fees for guardians appointed pursuant to Chapter 452 proceedings, stating:

> The guardian ad litem shall be awarded a reasonable fee for such services to be set by the court. The court, in its discretion, *may award such fees as a judgment to be paid by any party to the proceedings,* or

---

5. We believe the intent of the legislature is clear in cases under Chapter 210. Where a parent is accused of abuse and neglect that results in the Juvenile Court taking jurisdiction of a minor child, with its attendant proceedings which include the appointment of a guardian ad litem, no parent should have to bear the expenses of that proceeding if found not to have abused or neglected the child.

In proceedings such as this under Chapter 452, where an allegation of abuse is made but determined to be unfounded, at least in the eyes of the court, and child protective services are not implicated, there is no reason to give the accusing party the benefit of section 210.160.4.

may tax such fees as costs to be paid by the party against whom costs are taxed, or from public funds. Such an award of guardian fees shall constitute a final judgment in favor of the guardian ad litem. Such final judgment shall be enforceable against the parties in accordance with chapter 513, RSMo.

The award of the guardian ad litem fee as a judgment against Father is clearly authorized by section 452.423.4. Father also makes no complaint as to the reasonableness of the fee. The trial court did not err or abuse its discretion in granting a judgment against Father in the amount of $3,580.00 to pay the guardian ad litem and counselor's fees. Point denied.

The judgment of the trial court is affirmed in all regards.

All Concur.