**Rod Patrick McCREARY, Respondent,**

v.

**Juni Luann McCREARY, Appellant.**

**No. WD 52469.**

Missouri Court of Appeals,
Western District.

Aug. 19, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 30, 1997.

Application to Transfer Denied
Nov. 25, 1997.

Harold A. Walther, Columbia, for Respondent.

Daniel J. Pingelton, Columbia, for Appellant.

Before HANNA, P.J., and ELLIS and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

On June 20, 1994, appellant, Juni L. McCreary, filed what she designated as a petition, which more accurately would be designated as a motion, requesting the Circuit Court of Boone County to: (1) modify its child support decree increasing child support and to require payments to be made directly to the Boone County Circuit Clerk as trustee; (2) order an accounting and enter a declaratory judgment with respect to claimed unpaid child support and maintenance calculated pursuant to the parties' "Amended Separation Agreement"; (3) modify maintenance; (4) order respondent, Rod P. McCreary, to reimburse her for unpaid medical expenses of the children; and, (5) modify respondent's visitation. Respondent filed a counter-motion, requesting the court to change physical custody of the couple's two minor children to him. The trial court granted respondent's motion for change of custody and entered an order requiring appellant to make monthly child support payments to respondent of $135.00 per child.[1] The court denied appellant's motion in all respects, except for ordering respondent to pay her $7,256.91 in unpaid child support and maintenance and to make his maintenance payments to the Circuit Clerk of Boone County as trustee for appellant.

On appeal, appellant asserts six points of trial court error. Appellant claims that the trial court erred in: (1) changing physical custody of the minor children from her to respondent because the evidence was insufficient to support a finding that there was a substantial and continuing change in circumstances necessitating a change in custody; (2) failing to reopen the evidence after trial on respondent's motion to modify custody to consider testimony of the children regarding respondent's excessive drinking, abuse, and immoral behavior; (3) calculating the amount of child support and maintenance respondent was in arrears, because in doing so it miscon-

strued the parties' agreement governing the same; (4) failing to award her attorney's fees because the parties' agreement required a party in breach to be liable for attorney's fees, or in the alternative, because § 452.355.2 required it; (5) awarding respondent child support from appellant because he did not specifically request it in his counter-motion; and (6) failing to order respondent to reimburse appellant for medical expenses for the minor children as provided for by the parties' agreement.

We affirm in part and reverse and remand in part.

## Facts

The marriage of appellant, Juni L. McCreary, and respondent, Rod P. McCreary, was dissolved in the Circuit Court of Boone County on October 20, 1987. The parties had entered into a written separation agreement, which was approved by the trial court and incorporated into its decree. Pursuant to the separation agreement, physical custody of the parties' two minor children, V.J.M., born April 6, 1980, and R.P.M., born September 16, 1983, was awarded to appellant with visitation to respondent. The court, pursuant to the separation agreement, ordered respondent to pay child support of $275.00 per month per child, maintenance of $150.00 per month, and to maintain medical insurance for the benefit of the children. The agreement also required respondent to convey his interest in the parties' jointly owned real property and mobile home located thereon to appellant, who was to assume all indebtedness related to the property.

In April of 1989, the court entered an order that made several modifications to the parties' original separation agreement. The order incorporated portions of a stipulation by the parties, which ordered that respondent's child support and maintenance obligations no longer had to be paid to the circuit clerk's office. Instead, by the terms of the

---

1. "Per child" support orders are not in keeping with the mandate of Rule 88.01 and Form 14 and should not be entered. Presumed correct child support amounts calculated pursuant to Form 14 are calculated and expressed in the aggregate, not per child. Rule 88.01; Civil Procedure Form 14. Thus, i.e., the Form 14 presumed correct child support amount for a given set of parents for two children is not twice the amount it would be for one child. In addition, per child orders are misleading in that they imply that the termination of child support for one child would result in a per child or *per capita* reduction in the child support amount, which is not the case.

parties' stipulation, the respondent's child support and maintenance obligations were to be paid to the creditor financing the mobile home on the property conveyed to appellant in the dissolution. The remainder of the stipulation, which was not incorporated into the court's order, stated that if the monthly total of the child support and maintenance obligation was less than the monthly amount due on the mobile home, appellant would be responsible for the difference. In the event she was unable to pay the difference, the respondent would, and this amount paid by respondent would be counted as a "credit" against the "aggregated balance" he owed.

The children lived with respondent in Indiana from June, 1992, to November, 1993, notwithstanding the custody decree in effect at the time, and without the consent of appellant. They were then returned to appellant's custody.

On June 20, 1994, appellant filed a motion to modify the parties' agreement. The motion contained the following counts: Count I requested an increase in child support and a termination of their agreement applying child support to the mobile home debt; Count II sought an accounting and declaratory judgment with respect to the mortgage debt and respondent's child support and maintenance obligations; Count III requested an increase in maintenance; Count IV sought reimbursement for certain medical expenses; and Count V requested a modification of visitation. Respondent filed an answer and counter-motion to modify custody.

On November 6, 1995, the trial court entered its findings of fact and conclusions of law, which transferred sole physical custody to respondent, based on a determination of change in circumstance with respect to appellant's work schedule and respondent's better ability to support the educational, emotional and supervisory needs of the children. The court also ordered appellant to make child support payments of $135.00 per month, per child. It found that respondent owed appellant $7,256.91 in unpaid maintenance and child support and that future maintenance payments should be made directly to appellant. The court denied appellant's claim for

modification of child support and visitation, unpaid medical expenses and attorney's fees.

Appellant filed a motion to amend judgment and for the receipt of additional evidence on December 6, 1995. To it, she attached unsworn affidavits from the children and family members, which alleged, in part, physical abuse of the children by the respondent. The motion was heard on December 26, 1995, at which time the court appointed a guardian ad litem for the children and continued the motion. On January 8, 1996, the court heard respondent's motion for contempt and temporary custody. The children were not present at this hearing. The guardian ad litem testified that she could not determine whether the children were telling the truth in their allegations, and she had no opinion as to whether they should be called to testify. The court subsequently denied appellant's request to allow the children to testify and found that appellant had failed to turn the children over to respondent as required by the original change of custody order of November 6, 1995. Following the January 8 order, the children ran away from appellant. They were then located and transported to Indiana.

On January 11, 1996, the appellant filed a motion to stay order, and the guardian ad litem submitted a letter to the court stating that the parties' oldest child wished to be heard by the court. Appellant also filed a motion for an order directing parties to produce the children for an *in camera* hearing on February 8, 1996. Attached to the motion was the guardian ad litem's recommendation that the motion be granted. The court denied the motion to produce the children for testimony on February 20, 1996. Further, because the court did not rule on appellant's motion to amend of December 6, it became final on March 5, 1996. Appellant filed this appeal on March 12, 1996.

### Standard of Review

■ Our standard of review in a judge-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will affirm the judgment of the trial court, unless it is not supported by substantial evidence, or it is against the weight of the evidence or it

erroneously declares or applies the law. *Rogers v. Rogers,* 923 S.W.2d 381, 383 (Mo. App.1996). "When there is conflicting evidence, the trial court has the discretion to determine the credibility of the witnesses, accepting or rejecting all, part, or none of the testimony it hears." *Guier v. Guier,* 918 S.W.2d 940, 946 (Mo.App.1996). "Because the trial court is in the best position to weigh all the evidence and render a judgment based on the evidence, the judgment is to be affirmed under any reasonable theory supported by the evidence." *Id.* We will view the evidence in the light most favorable to the decision of the trial court. *Rogers,* 923 S.W.2d at 383.

## Discussion

### I. Change of Custody

In appellant's first point, she claims that the evidence was insufficient for the trial court to find that a substantial and continuing change in circumstances had occurred necessitating a change in the physical custody of the parties' minor children from appellant to respondent. We agree.

 Section 452.410.1 RSMo 1994,[2] sets forth the standard which must be met for modifying a prior custody decree. It provides in pertinent part as follows:

... the court shall not modify a prior custody decree unless it has jurisdiction under the provisions of § 452.450 and it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

A finding of changed circumstances under this section, is "a precursor to a finding that the best interests of the child necessitate a modification of a prior custody decree...." *Guier,* 918 S.W.2d at 947. "[T]here must be an evidentiary basis to support a finding of a 'change of circumstances,' which gives the trial court jurisdiction to consider making a change of custody. *Alt v. Alt,* 896 S.W.2d 519, 521 (Mo.App.1995)." *Sumnicht v. Sack-*

*man,* 906 S.W.2d 725, 727 (Mo.App.1995). The necessary change in circumstances under § 452.410.1 must relate to the circumstances of the children or their custodian, not the noncustodial parent. *Rogers,* 923 S.W.2d at 383. This change must be substantial and continuing in nature. *Riley v. Riley,* 904 S.W.2d 272, 276 (Mo.App.1995). "The change of circumstances must be of a nature that the child will substantially benefit from the transfer" and the welfare of the child requires it. *Guier,* 918 S.W.2d at 947. "Even if there is some showing at a modification hearing that a change of circumstances has occurred, such change must be significant before a child custody decree may be modified." *In re Marriage of D.L.M.,* 783 S.W.2d 473, 474–75 (Mo.App.1990).

 The party seeking to change custody has the burden of proving a change in circumstances and that the modification is necessary to serve the best interests of the children. *Rogers,* 923 S.W.2d at 383. In reviewing an order modifying child custody,

[a] great deal of caution should be exercised in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence, and only then upon a firm belief that the judgment of the trial court was incorrect. In child custody matters the trial court's determination must be given greater deference than in other cases.

*Guier,* 918 S.W.2d at 946 (citations omitted). However, if the evidence and testimony wholly fail to demonstrate a change in circumstances, there can be no change of custody which is in the best interests of the child. *Id.* at 947; *Sumnicht,* 906 S.W.2d at 727. There is a presumption that the party awarded custody in the original decree is a suitable custodial parent. *Guier,* 918 S.W.2d at 947.

 Here, the trial court made six specific findings as to what it found to be a change in circumstances on which it was relying in ordering a change of custody under § 452.410.1. We find that three of these findings do not relate to a change in circumstances of the custodial parent or the children as required by § 452.410.1, but relate

**2.** All statutory references are to RSMo 1994, unless otherwise indicated.

only to the noncustodial parent's superior ability to provide for the needs of the children, which goes to the best interests of the children. The superior ability of the noncustodial parent to provide for the children is a consideration in determining the best interests of the children, *Lisec v. Coy*, 793 S.W.2d 173, 177 (Mo.App.1990) (holding that a noncustodial parent's ability to provide a stable and comfortable home is not a change in circumstances of the child or custodial parent; however, it is a significant factor in determining how a child's best interest may be met), which issue is not reached, unless and until a substantial and continuing change in circumstances is first found. *Guier*, 918 S.W.2d at 947; *Sumnicht*, 906 S.W.2d at 727. Thus, we will first review to determine if the evidence here was sufficient to support a finding of a substantial and continuing change in circumstances warranting a change of custody. If not, we need not address the issue of whether the change in custody was in the best interests of the minor children.

The following are changes in circumstances cited by the trial court which do relate to the custodial parent and the children:

> a. [Appellant] is working as a security officer for the University of Missouri from 11:00 p.m. until 7:00 a.m. During such time periods, the minor children are without any supervision at their residence.

> b. Since the Divorce Decree of October 20, 1987, the minor children have resided with [respondent] in the state of Indiana, from June 15, 1992, until November 25, 1993.

> c. Prior to the minor children residing with [respondent] in the state of Indiana during the above time periods, [R.P.M.] earned below average grades in school. During their extended stay with [respondent], both minor children significantly improved their grades so that they were both earning substantially above average grades at the public schools in which they were enrolled in Indiana.

We will consider each of these findings individually.

## A. Lack of Supervision

On this issue, appellant testified at trial that when she worked at night from 11:00 p.m. to 7:00 a.m., she left her daughter, fifteen at the time of trial, in charge of her younger brother, twelve at the time of trial. There was no evidence in the record as to what arrangements appellant made for the children when she first began working nights. The question for us to decide is whether leaving the minor children at home while she worked at night constituted a substantial and continuing change in circumstances necessitating a change of custody under § 452.410.1.

The lack of proper supervision has been recognized as a consideration in determining whether there has been a substantial and continuing change in circumstances warranting a change in custody if found to be in the best interests of the children. *Johnson v. Johnson*, 758 S.W.2d 721, 724 (Mo.App.1988); *M.L.G. v. J.E.G.*, 671 S.W.2d 312 (Mo.App. 1984); *L E __(S __) v. J A E __*, 507 S.W.2d 681, 685 (Mo.App.1974). In *Johnson*, this court affirmed a change of custody of an eleven-year-old boy who was continually left alone overnight to care for his young nephews while his mother was out with her boyfriend. The court held that these facts, along with the fact the boy was sent to run errands on busy, high-speed streets, indicated a lack of supervision which constituted a substantial change in circumstances. In *M.L.G.*, this court reversed the trial court in refusing to modify the custody of a ten-year-old girl. The court's decision was based on the life-style of the mother, who left her daughter alone after school, during the evenings and overnight, while she spent the night at her boyfriend's, and had men spend the night in her apartment with the daughter present. And, in *E __(S __) v. E __*, this court affirmed the change of custody of five boys ranging in age at the time of trial from six to sixteen years. The factors relied on by the appellate court in affirming a change of custody, were that: (1) the mother was preoccupied with her boyfriend, frequently leaving her sons alone or with babysitters until early morning or all night; (2) while left alone, the younger boys were frequently cry-

ing and the older boys were home while school was in session; (3) the oldest boy was failing in school and experimenting with marijuana; and, (4) the boys were not receiving proper dental care. *E ___(S ___) v. E ___,* 507 S.W.2d at 685.

In finding that the "lack of supervision" of the minor children was a substantial and continuing change in circumstances warranting modification, the trial court here implicitly found that the fifteen-year-old daughter being left in charge of herself and her twelve-year-old brother overnight while their mother worked was not appropriate. However, the trial court did not articulate why it was not appropriate. Thus, we look to the record to see if it will support such a finding.

Before turning to our analysis of the record, we deem it is necessary to define what is meant by a "lack of supervision" as it relates to child custody proceedings. As noted *supra,* appellate courts have recognized the "lack of supervision" under the appropriate facts as constituting a substantial and continuing change in circumstances warranting modification. However, neither party cites any Missouri cases nor can we find any that have defined the phrase "lack of supervision" as it relates to our child custody statutes. Thus, we are left to our own devices.

■ "Supervision" is generally defined as: "the action, process, or occupation of supervising; *esp:* a critical watching and directing (as of activities or a course of action)." Webster's Ninth New Collegiate Dictionary 1185 (1986). In § 452.375, one of the factors required to be considered in determining initial custody "in accordance with the best interests of the child" is the "mental and physical health of all individuals involved." Similarly, § 452.400, dealing with visitation and its modification, specifically authorizes the denial of visitation to a parent if such "visitation would endanger the child's physical health or impair his emotional development" as being contrary to the child's best interests. The language in both §§ 452.375 and 452.400 evinces a concern by our legislature that minor children should be supervised at all times to the extent necessary so as not to expose them to circumstances that could endanger their physical health or impair their mental or emotional development. This concern would logically extend to modification of custody as being a relevant factor in determining whether a substantial and continuing change in circumstances has occurred, which would warrant a change in custody. Thus, we find that a "lack of supervision" in the context of a modification of custody proceeding should be defined as a failure to provide supervision such that a minor child's physical health would be endangered or his or her mental or emotional development impaired. With this definition to guide us, we turn to the record to determine if the fifteen-year-old daughter being left at night to supervise herself and her twelve-year-old brother, while her mother worked, constituted a lack of supervision warranting modification of custody.

A review of the record reveals that, on this issue, there was precious little asked by the attorney of either party. In this respect, because respondent had the burden of proof on his motion to modify, he would suffer from a deficient record. As to this issue, appellant testified that she worked from 11:00 p.m. to 7:00 a.m. at the University of Missouri as a security guard and had since 1990. She also testified that she would seek a job on the day shift as soon as one was available that paid as well as the night shift. She testified that she arrived home in the morning before the children went to school and would routinely take them to school. She further testified that she was generally awake when they arrived home from school and that they ate their evening meals together as a family. As to supervision, respondent testified as follows:

Q. Are you concerned about the living arrangements today?

A. I'm terribly concerned about it. I have been. The fact is that my beautiful daughter out there—

(Objection made and sustained)

Q. What concerns do you have about their living arrangement?

A. There's a couple of things. Primarily, that there is no supervision, effective supervision at night in the hours of a quarter till 11:00 to 7:15 in the morning five days a week.

Q. What problems—

A. The area they live in I have a lot of experience with in my past years as a deputy with the sheriff's office. It's a violent area. It is loaded with people who have no great sense of morals, ambitions, or anything else. My daughter is dating a young man by the name of Wilhite. I'm familiar with that, familiar—

(Objection made, but not ruled)

Q. Have you had a conversation with that man?

A. Mr. Bryan Wilhite called my home collect searching for my daughter.

Q. Do you have any particular concerns regarding your daughter and her living arrangements where Juni is away all night?

A. I certainly do.

Q. Why?

A. [V.J.M.] is a typical teen-ager, and at those ages it's—she's very—During evening hours, she's leaving her brother totally unsupervised at that point. And [R.P.M.]—and she's capable of doing anything given the opportunity. And, well, and what that could lead to is anybody's guess. But I have a strong and serious concern as to the future of those children.

This constituted the sum and substance of respondent's testimony on the issue of a lack of supervision while appellant worked.

In his brief and in his testimony, respondent asserts that the area where the children lived was a violent one. However, he did not testify as to what he meant by violent and further testified that this conclusion was based on his experience as a deputy sheriff, but did not testify as to how many years ago he was a deputy. It is significant to note that respondent had moved to Indiana some years ago, and that he did not indicate how he was presently familiar with the violent tendencies of the area. As a result, there is no way to divine from the record what the area is like today, which is the relevant point of reference. In his brief, respondent also contends that V.J.M. was leaving her brother alone at night while she was "dating." There

is nothing in the record to support this contention. In testifying that V.J.M. was leaving her brother at home alone, respondent did not testify as to why, when or how regularly V.J.M. was doing this, or on what he was basing his conclusion.

At the time the trial court entered its judgment changing custody, the record, as a practical matter, was totally void as to any evidence of: (1) any personal attributes of the fifteen-year-old which would demonstrate that she could not provide proper supervision for herself and her brother while their mother worked; and, (2) any specific incidents which would demonstrate that the arrangement in question had directly harmed the children in any way. In this respect, respondent, although he had the burden of proof, chose not to request the trial court to interview his daughter so the court could determine if she possessed sufficient intelligence and maturity to provide the necessary supervision to safeguard the physical and mental health of herself and her brother. Other than his unsupported conclusion that she was leaving her brother alone while she dated, he did not testify as to any specific incidents that demonstrated the inability of the fifteen-year-old to supervise herself or her brother or that they had been harmed by this arrangement. Unless, under the law and the facts of this case, the age of V.J.M., in and of itself, rendered the supervisory arrangement in question harmful to the minor children, we find there is no substantial evidence from which the trial court could find a "lack of supervision" requiring a change of custody to respondent. Thus, we will examine whether age alone can constitute a *per se* basis for finding a "lack of supervision" in the context of a modification of child custody proceeding.

In *M.L.G. supra*, this court recognized that it "is not necessary to wait for manifestation of harmful consequences before action is taken." *M.L.G.*, 671 S.W.2d at 315. "[W]hen there is a reasonable likelihood of an adverse affect [sic] on the child," it is simply not sensible to wait until the damage is done to change his or her custody. *Id.* at 315–16. In this respect, this court stated in *M.L.G.* that:

[t]he fact that no evidence suggested that [the child] had suffered severe emotional disturbance by the time of the hearing cannot justify the refusal to change her primary custody. The evidence clearly reveals [the mother's] neglect of [the child] and the girl's continuous exposure to [the mother's] immoral life style. To leave a girl of 10 in that environment is likely to lead to severe emotional disturbance as well as adversely affect the development of her own character and morality. Under the circumstances, the court should not await actual damage before taking action to remove [the child] from the unwholesome influence of her custodial parent.

*Id.* at 316. Using this as our standard, the question we must answer is, even absent any evidence of manifested harm, does the supervisory arrangement here present a reasonable likelihood that the children's physical health would be endangered or their mental or emotional development impaired?

Clearly, there are instances where the age of the child alone would justify a finding by the trial court that the child being left alone, under any circumstances, presented a reasonable likelihood of harm. For example, no one would quibble with the fact that a five-year-old should not be left alone overnight for any reason. We would presume that such an arrangement presents a reasonable likelihood of harm to the child. However, reasonably and logically, such a presumption would cease to exist at some age where we recognize that depending on the individual and the totality of the circumstances, he or she may be capable of being left overnight.

 Where the line should be drawn defies any bright line analysis. Is it fourteen, fifteen, sixteen, or seventeen? We need not answer the question here. It is sufficient here to say that we are not prepared to find that a fifteen-year-old is presumptively incompetent, regardless of the individual circumstances, to supervise herself and a younger sibling while a mother works at night at honest work to support them. In determining whether there is a reasonable likelihood of harm resulting from a supervisory arrangement, we find that the trial court must look at the totality of the circum-

stances, and not solely rely on age, unless the child is of such an age that the court can find that there is a reasonable likelihood of harm resulting regardless of the circumstances.

 In this case, the evidence is uncontroverted that the children at the time of trial were fifteen and twelve years of age, neither of whom suffered from any mental or physical handicaps. On April 6, 1997, V.J.M., turned seventeen. R.P.M. will turn fourteen on September 16, 1997. They were only left overnight while appellant worked from 11:00 p.m. to 7:00 a.m. Appellant's work was local and only ten to fifteen minutes away by car. She could be reached by telephone in the case of emergencies. Appellant was home in the mornings to see the children off to school and in the evenings to eat meals and spend time with them prior to leaving for work around 10:45 p.m. There is no evidence that she neglected them in any manner while she was in the home with them. There was no evidence demonstrating that the children had actually been harmed by being left alone while appellant worked. Under the totality of these circumstances, we find it was error for the trial court to find that there was a substantial and continuing change in circumstances based on a lack of supervision warranting a change in custody.

In his brief, respondent does cite us to three cases that he contends support his claim that the trial court was justified in changing custody for a lack of supervision. He first cites us to *Armstrong v. Armstrong*, 877 S.W.2d 127, 130 (Mo.App.1994). In this case, the Eastern District upheld a change of custody finding that the father's change in occupation was a justifying change in circumstance in that, as a result of the change in occupation, the minor children were spending the vast majority of their time with the father's new wife and that the father essentially had "abdicated his responsibility for the children" to their stepmother. *Id.* Under these circumstances, the court reasoned that the nonparent (stepmother) had become the primary care giver and that a modification was warranted. Further buttressing its decision, the court stated that:

Furthermore, such a decree is contrary to the stated policy of Missouri, which is 'to

assure children frequent and meaningful contact with both parents' and 'encourage parents to share decision-making rights and responsibilities of child rearing.' § 452.375.3; *See also, Cornell v. Cornell,* 809 S.W.2d 869, 873 (Mo.App.1991) (policy of state to afford children ample opportunity for close contact with both parents). This change in circumstances alone is enough to warrant a modification of custody. *See, Caywood v. Harris,* 646 S.W.2d 144, 144–45[1] (Mo.App.1983); *Cf.* § 452.375.2(6) (ability and willingness of Father to perform his parental function is relevant factor).

*Id.* at 130–31.

In finding that a change in circumstances had occurred, the *Armstrong* court was obviously keying on two of the eight "best interests" factors found in § 452.375.2, specifically (6) and (8), which provide as follows:

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actually perform their functions as mother and father for the needs of the child;

. . . .

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

§ 452.375.2. The "abdication" of parental responsibility language used by the court logically comes from factor (6) and the "meaningful contact" language from factor (8). In *Sumnicht, supra,* this court, citing *Armstrong,* recognized that "[t]he failure of a parent to have frequent and meaningful contact can amount to a change of circumstances." *Sumnicht,* 906 S.W.2d at 728. However, the issue and facts of our case are distinguishable from those of *Armstrong.*

The issue in *Armstrong* was not a "lack of supervision," as is the case at bar, but an "abdication" of parental responsibility. The mother there was not contending that the stepmother was not providing adequate supervision, but only that the father by delegating the supervision of the children to his new wife, had abdicated his responsibilities as a parent and was not having frequent and meaningful contact with them. Regardless, even if the issue in our case was abdication of parental responsibility, there is no substantial evidence here, even when viewed in its most favorable light to respondent, to support the fact that appellant abdicated her parental rights or did not have frequent and meaningful contact with her children because of her employment. To find as such, we would have to find in all cases of single parents working at night, regardless of what arrangements they made for the care of their children and whatever other contact they may have with them, that they had abdicated their rights as parents and were not worthy of having primary physical custody of their children. We refuse to go down such an unreasonable and mean-spirited path. And, even if *Armstrong* was meant to be construed in this fashion, and we find it was not, then we would refuse to follow it.

Respondent next cites us to *M.P. v. S.P.,* 793 S.W.2d 510 (Mo.App.1990) in support of his argument that there was a lack of supervision here warranting modification. In this case, the Eastern District reversed and remanded the trial court's refusal to change custody. The Eastern District reversed and remanded on the basis of substantial evidence in the record of sexual misconduct on the part of the mother adversely affecting the children, the mother's mental health as demonstrated by her attempted suicide, and the mother's job requiring her to leave the children almost every night with the father from 8:00 p.m. to 7:30–8:00 a.m. It is apparent that the mother's leaving the children with the father while she worked was only one factor in the change in custody. In any event, like *Armstrong,* this was not a lack of supervision case, but a case where one parent, because of her employment, was leaving her children with the other parent for significant periods of time constituting an abdication of her parental responsibilities. With respect to the custodial parent's employment, the issues raised in *M.P.* are essentially the same as those raised in *Armstrong,* making it equally distinguishable and nonpersuasive as *Armstrong* here under the facts and circumstances of the case at bar.

Respondent finally cites us to *In re Marriage of Haubein,* 726 S.W.2d 433, 435 (Mo. App.1987). This case did not involve a modi-

fication of custody, but involved an original determination of custody in a dissolution of marriage proceeding, in which case, under § 452.375, the trial court was not required to first find a change in circumstances before determining the best interests of the child in awarding custody. Whereas, in an original determination of custody, the trial court goes directly to the weighing of the best interests of the children using the statutory factors set out in § 452.375.2.

As to the issue of the mother's employment and being gone from the home, the *Haubein* trial court weighed the best interests factors of § 452.375.2 and came down on the side of the father holding that he would "provide a more stable home environment" for the children. *Id.* at 436. "More," as used in the phrase "provide a more stable home environment," connotes, in making a best-interests determination, as opposed to a change-in-circumstances determination, that a comparison is being made between the two parents' ability to provide a stable environment. In the context of a modification proceeding, such a comparison is not made, unless and until the court first finds a substantial and continuing change in circumstances, and then considers the best interests of the children as the statute directs. In the context of a modification proceeding, the court would first have to find that the change in employment resulted in the custodial parent being unable to provide a stable environment, not that the noncustodial parent could provide a better one. This distinction is significant, in that to hold otherwise would be to forever pit the parents in a contest to determine who could more provide a better home and environment, regardless of the adequacies of what the custodial parent was able to provide, which remained unchanged since the prior decree of custody. In effect, this would destroy the required finding of a change in circumstances of the custodian or children as a "precursor" to modifying custody, which is designed to effectuate a policy of stability for the children. As we held in *McClain,* "information pertaining to [the noncustodial parent] is irrelevant concerning proof of change in circumstances under the first part of § 452.410 .... information of

[the noncustodial parent's] lifestyle and suitability of her environment for a child ... is relevant in determining what is in the child's *best interests.* ..." (Citations omitted). *McClain v. Chaffee,* 894 S.W.2d 719, 722 (Mo.App.1995) (emphasis added).

The logic in distinguishing between "finding a change in circumstances" and "weighing best interests" as they relate to modification of custody proceedings was relied upon by this court in *Sumnicht,* where we specifically rejected the argument that the best interests factor under § 452.375.2(8) of a parent being "more *likely* of the two parents to allow the child frequent and meaningful contact with the other parent" constituted a change in circumstances necessitating a change in custody. *Sumnicht,* 906 S.W.2d at 727 (emphasis added). The court held that there would have to be something other than a parent being "more" likely to afford the other parent frequent and meaningful contact, such as a willful violation of the court's decree as to visitation, to constitute a change in circumstances warranting modification of custody. *Id.* at 728. There was no evidence of that here. And, there was no substantial evidence to find that the appellant, because of her employment, was not providing a stable environment for the children, regardless of whether respondent could provide a more stable one.

In summary, we find there was no substantial evidence from which the trial court could find that the children's physical health was actually endangered or that their mental or emotional development was actually impaired by being left alone while appellant worked, or that under the totality of the circumstances, there was a reasonable likelihood that this would occur from their being left alone. Thus, we find it was error for the trial court to change the physical custody of the children to respondent based on a finding of a substantial and continuing change in circumstances because the children suffered from a lack of supervision while appellant worked.

**B. Temporary Custody by Respondent in Indiana**

 The trial court also found that the children's residing with respondent in

Indiana from June 15, 1992, to November 25, 1993, to be a substantial and continuing change in circumstances warranting a change in custody. We disagree.

The trial court found and the evidence here, viewed in a light most favorable to respondent, supports the fact that respondent kept the children in Indiana without the consent of appellant and in violation of the court's custody decree. Respondent testified that he felt it was in the best interests of the children that they stay in Indiana with him and did not seek to modify the court's decree because he wanted the money that would have to be spent on lawyers to modify the decree to go for the benefit of the children, i.e., college expenses. He only sought modification after appellant filed her motion seeking, *inter alia*, to recover alleged past-due support and maintenance.

This court has recognized that the "[m]odification of a custody order is proper where the custodial parent *allowed* the child to stay with the noncustodial parent for an extended period of time, the child had become established in a new school and community, and the child desired to remain with the noncustodial parent. *Indermuehle v. Babbitt*, 771 S.W.2d 873 (Mo.App.1989); *Morrison v. Morrison*, 676 S.W.2d 279 (Mo.App.1984)." *McClain*, 894 S.W.2d at 723 (emphasis added); *see also Lee v. Lee*, 767 S.W.2d 373, 375 (Mo.App.1989). However, respondent cites us to no cases nor can we find any that stand for the proposition that the keeping of a child in violation of a court's decree and without the consent of the other parent can be used as a change in circumstances justifying a change in custody. In fact, in *Knoblauch v. Jones*, 613 S.W.2d 161, 167 (Mo.App.1981), the court recognized that a noncustodial parent's failure to return a child after court-ordered visitation is completed, much like a custodial parent's interference with visitation, can be the basis for a modification or the denial of a modification. The logic be-hind the court's reasoning in *Knoblauch* is sound in that, if under § 452.377 a custodial parent can lose custody for interfering with a noncustodial parent's visitation, logically a noncustodial parent, who violates the court's decree by interfering with a custodial parent's custody, should be subject to having their visitation limited or from being successful on his or her motion to modify custody under § 452.410. Although the award of custody is not to be viewed as a reward to a party obedient to the court's order or punishment to a disobedient party, *id.* at 167, a court should give some consideration to the fact that the change in circumstances alleged by the noncustodial parent seeking a change in custody is a change precipitated by an action of the noncustodian in violation of the court's custody decree without consent of the custodial parent.

Other than a lack of consent, there are further reasons why the children's stay in Indiana was not a substantial and continuing change in circumstances. At the time of trial, the children had already been voluntarily returned by respondent to appellant and had resided with her for over three years.[3] Thus, this alleged "continuing" change in circumstances was not, in fact, continuing. Further, as we recognized in *McClain, supra*, the courts are loath to change the custody of children in that to do so uproots them from familiar surroundings. Thus, as in *McClain*, where the children have been living for a significant period of time with the noncustodial parent, the court is very reluctant to uproot them and send them back to the custodial parent, even though he or she has been granted custody. *See also Humphrey v. Humphrey*, 888 S.W.2d 342, 345 (Mo.App. 1994) (holding that "[t]here is much value in allowing children to remain with the parent who has custody as opposed to uprooting them and transporting them to a new home"). However, in the case at bar, the reverse occurred. Because here the children

---

3. In this respect, although not interviewed by the trial court, the evidence was and the court conceded that the children were satisfied with their present living arrangements with their mother and undoubtedly wanted to stay with her. Section 452.375.2(2) provides that the wishes of a child as to his or her custodian are to be consid-ered when determining best interests in a custody proceeding. *See In re Marriage of Haynes*, 913 S.W.2d 73 (Mo.App.1995) (holding that although the wishes of a child as to his or her custodian are not controlling, they are to be taken into consideration).

had been back with their mother for over three years at the time of trial, the result of the trial court's order modifying custody was to uproot the children from the custodial parent's home, not the noncustodial parent's home, as was the case in *McClain* and *Lee* cited *supra.*

Under the circumstances here, we find that the children's stay in Indiana with respondent, without appellant's consent, was not a substantial and continuing change in circumstances warranting a change in their custody to respondent.

## C. Children's Grades

 Finally, the trial court found a change in circumstances with respect to the children's alleged academic improvement while staying with respondent in Indiana. In this respect, the trial court found that:

> Prior to the minor children residing with [respondent] in the state of Indiana during the above time periods, [R.P.M.] earned below average grades in school. During their extended stay with [respondent], both minor children significantly improved their grades so that they were both earning substantially above average grades at the public schools in which they were enrolled in Indiana.

Even assuming *arguendo,* that this finding was a substantial change in circumstances warranting a change in custody, the record does not support the finding.

The favorable evidence to respondent on this issue comes from his testimony. In this regard, respondent testified that:

Q. How did these children do in school in Indiana?

A. They weren't the best students, but they were fine. They showed improvement all the time. [R.P.M.'s] grades were average or above average. [V.J.M.'s] grades weren't exceptional. She has a little difficulty with math, but above average.

The record reflects that after R.P.M. returned from staying with respondent he had to be held back a year in school. We find this evidence to be wholly insufficient for the trial court to find that there was "substan-

tial" improvement in the children's academics warranting a modification of custody.

In summary on Point I, we recognize that in a child custody case, more so than in other civil cases, we are to pay a great deal of deference to the trial court's decision as to who should be awarded custody. *Guier,* 918 S.W.2d at 946. However, in a case of modification, such as in the instant case, as opposed to an original determination of custody, before a trial court can make the decision who should have custody in order to best serve the interests of the children, it must first be presented with a sufficient evidentiary basis for finding a change in circumstances as required under § 452.410.1. *Id. Sumnicht,* 906 S.W.2d at 727. In the case at bar, although the record supports a finding of some changes in circumstances of the children and custodian since the previous decree of custody, we find the record does not support a finding of a substantial and continuing change in circumstances warranting modification. Thus, we reverse and remand the trial court's judgment with respect to the change of custody with directions that it enter judgment transferring custody of the minor children back to appellant.

## II. Appellant's Motion to Reopen for Additional Evidence

In Point II, appellant claims that the trial court erred in refusing to allow her to reopen the case for the receipt of additional evidence on respondent's motion to modify. Her motion to reopen alleged that the children should be allowed to testify as to their allegations that respondent, while in temporary custody of them, abused alcohol, used pornography, physically abused R.P.M., and failed to provide adequate supervision. In this regard, the only evidence already in the record was respondent's testimony that he had shared a bedroom and bed with his first cousin while the children were living with him, but that they did not engage in sexual relations.

Because we have already held, *supra,* that it was error for the trial court to change custody to respondent, this point is moot as to the change of custody. However, given the importance of these allegations of abuse

to the welfare of the children while in respondent's custody during visitation; the fact the daughter had run away from respondent's home after the trial court ordered her custody changed; and, the fact the trial court refused to reopen the case to hear testimony from the children on these allegations, we direct on remand that the trial court satisfy itself that there is no basis for the allegations of the children and that they are in no danger from respondent during visitation with him.[4]

In directing the trial court to satisfy itself as to the merit of the allegations of abuse of the children, we note that the trial court in response to those allegations did appoint a guardian ad litem pursuant to § 452.423. This section provides in pertinent part:

1. In all proceedings for child custody or for dissolution of marriage or legal separation where custody, visitation, or support of a child is a contested issue, the court may appoint a guardian ad litem. The court shall appoint a guardian ad litem in any proceeding in which child abuse or neglect is alleged.

2. The guardian ad litem shall:

(1) Be the legal representative of the child at the hearing, and may examine, cross-examine, subpoena witnesses and offer testimony;

(2) Prior to the hearing, conduct all necessary interviews with persons having contact with or knowledge of the child in order to ascertain the child's wishes, feelings, attachments and attitudes. If appropriate, the child should be interviewed;

(3) Request the juvenile officer to cause a petition to be filed in the juvenile division of the circuit court if the guardian ad litem believes the child alleged to be abused or neglected is in danger.

3. The appointing judge shall require the guardian ad litem to faithfully discharge his duties, and upon failure to do so

shall discharge him and appoint another....

As their representative, the guardian ad litem is to stand in the shoes of the children and weigh the factors as they would weigh them if their judgment was mature. *Guier*, 918 S.W.2d at 950. "The guardian's principal allegiance is to the court and his function is to *advocate* what he believes to be the best interests of the children." *Id.* (emphasis added). Under this section, it is the duty of the guardian ad litem to protect the best interests of the children. *Id.* And, although the guardian ad litem is not required to make a formal, explicit recommendation to the court, *id.* at 951–52, "it is imperative that the guardian ad litem, [sic] investigate and have input on the perspective of the child's best interest and this be presented to the trial judge." *In Interest of J.L.H.*, 647 S.W.2d 852, 860–61 (Mo.App.1983). The trial court is mandated under the law to monitor the guardian ad litem to insure that he or she does what is necessary to protect the best interests of the minor children. *Guier*, 918 S.W.2d at 950.

The record here is very sketchy as to exactly what investigation the guardian ad litem did to protect the best interests of the children and reflects little input from or advocacy by her on behalf of the children. To get a feel for what the guardian ad litem did in this case, the following excerpts from the transcript are instructive:

MS. DECKER: Sorry. I have. I have talked to the children. Frankly, I don't know what either of these gentlemen expect me to do. It's not possible for me to tell who's telling the truth and who's not. The kids have some concerns, but there are also things going on here that they are not necessarily a good environment for the children. So I really don't have any opposition [to the children testifying]. I'm not prepared to say one way or the other.

---

4. We recognize the trial court's stated concern that V.J.M may have run away in an attempt to "manipulate" the court into changing custody back to appellant. We also recognize that this is something that trial courts must be wary of in determining the validity of a child's allegations of abuse against a parent. Thus, on remand we leave it to the trial court to determine whether V.J.M.'s running away from respondent's home has any relevance to the children's allegations of abuse by respondent.

THE COURT: I'm not—Counsel, I'm not interested in hearing a lot of things that I didn't hear at the hearing that I could have heard in the matter. And what you were telling me last time, Mr. Pingelton, is a lot of the evidence you just didn't present because you didn't think you had to present at that point.

. . . . .

THE COURT: I hear a request from you to hear further evidence concerning the boy. I don't hear a request from his lawyer asking for additional evidence concerning that.

MR. PINGELTON: I met with the children after they talked to Mrs. Decker. And it was my understanding they're going to have to testify. I think they were reluctant to do that at first. They indicated to me that you told them that you have to testify if you want the court to hear these things.

MS. DECKER: We did have that discussion that there was going to be a hearing, they would be required to testify, and what that would entail. But I did not tell them I wanted them to testify. Do I want the kids to testify? I don't have any feeling one way or the other.

. . . . .

MS. DECKER: I have—I do believe that the children at this point would rather stay in Columbia. But I don't hear from them this terror that Dan [Mr. Pingelton] describes. They would rather stay here. They've been in the custody of the mother and they don't necessarily want to go to Indiana. But I don't have a strong feeling about them going or staying here, but I am concerned about a lack of supervision in the evening.

Although the guardian ad litem may have, in fact, done all she possibly could, because there is some question as to exactly what she did to protect the welfare of the children in regard to the allegations of abuse made by them and because the trial court received little input from her, we are directing the trial court on remand to examine what the guardian ad litem did do and satisfy itself that the children will not be subjected to any possible abuse while in the custody of respondent for visitation.

### III. Calculation of Unpaid Child Support and Maintenance

In this point, appellant claims that the trial court erred in failing to correctly calculate pursuant to their agreement the amount respondent owed her in back child support and maintenance. Respondent admitted at trial that pursuant to the agreement of the parties, he owed appellant $7,256.91 in unpaid support and maintenance, which the trial court found to be the amount owed. However, appellant contends that, under their "Amended Separation Agreement," respondent actually owed her $15,007.79.

Pursuant to the parties' original separation agreement and their decree of dissolution of marriage, respondent was ordered to convey all of his interest in the parties' twenty-five-acre farm and mobile home located thereon, with appellant to assume any indebtedness on the land and mobile home. Approximately a year and a half after their dissolution, the parties negotiated and entered into what they designated as an "Amendment to Separation Agreement" which would: (1) modify respondent's visitation rights; (2) allow respondent to make payments to CitiCorp on the mobile home as credits against child support and maintenance payments; (3) allocate the parties' litigation expenses that had been incurred as a result of respondent's then pending motion to modify; (4) modify the date of termination of respondent's maintenance payments to appellant; (5) appoint respondent as "leasing agent" for the property; and, (6) incorporate an attorney fee enforcement clause. No direct order was entered by the trial court on this agreement. Thereafter, however, the parties entered into a "Stipulation," which was incorporated in the court's order of April 18, 1989, which, *inter alia*, ordered the parties to be bound by the "Amendment to Separation Agreement." Although not in as much detail as the "Amendment to Separation Agreement," the "Stipulation" specifically referred to the modification in respondent's visitation rights and respondent's support and maintenance payments allowing him to receive credit

against these payments for mortgage payments made to CitiCorp and for expenses incurred in managing the property.

Respondent testified at trial that each month his payments to CitiCorp were less than the amount he owed in child support and maintenance by $189.27. However, rather than pay over this balance to appellant as support and maintenance, respondent testified that pursuant to their agreement, the monthly balances were credited against an "aggregated balance," against which certain expenses incurred by him in managing the property were to be aggregated or accrued. The dispute over the amount of arrearages centered on what expenses could be properly charged by respondent against this "aggregated balance" pursuant to the parties' agreement to reduce the amount he owed for child support and maintenance. On the issue of credits, the trial court in its findings of fact and conclusions of law, found, in pertinent part, as follows:

10. This Court finds that Petitioner/Respondent [Mr. McCreary] owes Respondent/Movant [Ms. McCreary] the sum of $7,256.91 in unpaid maintenance and child support since the date of the last modification decree of this Court, dated April 18, 1989. *That amount is the amount the child support and maintenance payments exceed the payments to Citicorp Acceptance Corporation.* Petitioner/Respondent is not entitled to a credit on said amount in light of the extended period of visitation in 1992 and 1993 as there is no showing that Respondent/Movant voluntarily relinquished custody during said period. *Nor is Petitioner/Respondent entitled to deduct miscellaneous out of pocket expenses in maintaining and managing the mobile home.* The Court enters judgment for Respondent/Movant and against Petitioner/Respondent in the amount of $7,256.91 under count II (emphasis added).

In this finding, the trial court disallowed any credits against child support and maintenance, except "payments to Citicorp Acceptance Corporation." This being the case, there is nothing in the record to support the trial court's award of the $7,256.91 in past-

due child support and maintenance, except respondent's conclusion that this was the amount owed. This amount was calculated by respondent in reliance on credits he testified he was taking for expenses in managing the property, which is contrary to the finding of the court regarding permissible credits. We find that under the circumstances of this case that respondent's conclusion as to what he owed after deducting expenses other than for payments to CitiCorp, in and of itself, would not constitute substantial evidence of what he owed in child support and maintenance after credits.

Respondent recognizes in his brief that the trial court denied him any deductions against child support and maintenance for "miscellaneous out of pocket expenses in maintaining and managing the mobile home." Nonetheless, respondent contends that the trial court was still correct in finding that he only owed $7,256 in unpaid child support and maintenance. Respondent bases this contention on two assertions: (1) he was entitled to deduct expenses other than miscellaneous expenses, without specifying what those were; and, (2) the burden was on appellant, not him, to demonstrate which specific credits respondent was entitled or not entitled to take in proving she was owed unpaid child support and maintenance. We reject both contentions.

 The trial court's finding on this issue is clear—the amount respondent owed to appellant for unpaid child support and maintenance was "the amount the child support and maintenance payments exceed[ed] the payments to Citicorp Acceptance Corporation." No other credits or deductions were allowed, with miscellaneous expenses in managing the property being specifically excluded. It is unclear where respondent gleans that the trial court was allowing him to deduct expenses in managing the property, other than miscellaneous expenses which were disallowed. We cannot find any support in the record for this distinction.

Respondent also contends that appellant had the burden to show which expenses he could and could not deduct and that she failed in her burden. From this, he argues that the trial court was free to find that he

only owed $7,256.91 in unpaid child support and maintenance because there was no evidence to show that he had not taken proper credits for payments made in managing the property. First, this ignores the trial court's finding that the only credits he could take were for payments on the mortgage to Citi-Corp. Second, this misstates the law in regard to the burden of proof in a claim for an equitable accounting, which was prayed for by appellant in Count II of her pleadings.

■ An equitable accounting is an appropriate remedy where there is a duty to account arising from a fiduciary relationship existing between the parties. *Chapman v. Dunnegan,* 665 S.W.2d 643 (Mo.App.1984). In this case, a fiduciary relationship existed between respondent and appellant in that, pursuant to their agreement, respondent was, in effect, authorized to manage and control child support funds, which were to go to appellant for the benefit of the children, and maintenance funds which were to go to appellant for her benefit. *Bossaler v. Red Arrow Corp.,* 897 S.W.2d 629, 631 (Mo.App. 1995). As a fiduciary of the funds in question, respondent was "obligated to keep complete and accurate records" and "[bore] the burden of proving what any cost or absent records would show." *In re Estate of Condren,* 756 S.W.2d 599, 602 (Mo.App.1988). Thus, contrary to respondent's contention as to the law, he had the burden to show to which credits against child support and maintenance, if any, he was entitled to take and suffers the burden of nonpersuasion, which he tries now to impose on appellant.

■ We find the record does not support the trial court's finding as to the amount of the unpaid child support and maintenance due from respondent. Further, it is impossible to determine from the record developed what the correct amount should be. Thus, we are forced to reverse and remand for the trial court to make specific findings as to: (1) the total amount of child support and maintenance which was due for the time period in question; and, (2) the specific types and amounts of the credits that it will allow against the total child support and maintenance it finds due; and then to enter its judgment as to the amount respondent owes appellant in unpaid support and maintenance.

As to child support, because the trial court changed custody to respondent, it denied appellant's motion to modify respondent's child support payments. In her motion, appellant had requested respondent's child support to be increased and his payments to be made directly to the circuit clerk as trustee, rather than allowing him to take credits against his child support for loan payments on the mobile home and expenses incurred in managing the property. Because we are remanding this cause to the trial court to transfer custody of the children back to appellant, the issue of respondent's child support payments to appellant will necessarily be back before the trial court. Thus, it is necessary for us to address the issue of how respondent's future child support payments are to be made so that the trial court will have proper guidance on remand, although we would note that the trial court has already taken the commendable step of ordering respondent's maintenance payments to be made directly to the Circuit Clerk of Boone County, unencumbered by the credit and diversion provisions of their "Amended Separation Agreement."

■ Section 452.345.2 provides in pertinent part that *"[a]t any time* the court, upon its own motion, may, or *upon the motion of either party shall,* order that maintenance or support payments be made to the circuit clerk as trustee for remittance to the person entitled to receive the payments." (Emphasis added). We interpret this to mean that upon appellant's motion to modify for respondent to pay child support directly to the circuit clerk that the trial court is mandated to order the same. We find this would be so even in light of the provisions of the parties' "Amended Separation Agreement" and "Stipulation," which were incorporated in the court's decree and which provide, *inter alia,* that respondent could take credits against child support for making mortgage payments on the mobile home and expenses incurred in managing the property.

■ Under § 452.325.2, dealing with the binding effect of separation agreements, the trial court is not bound by the parties' agreements as to child custody, support, or visita-

tion. *Williams v. Cole,* 590 S.W.2d 908, 911 (Mo. banc 1979); *In re Marriage of Glueck,* 913 S.W.2d 951, 955 (Mo.App.1996); *Hembree–Shanaberger v. Shanaberger,* 903 S.W.2d 202, 204 (Mo.App.1995); *Kocherov v. Kocherov,* 775 S.W.2d 539, 540 (Mo.App. 1989). The parties cannot by separation agreement, even if incorporated in the decree, preclude the trial court from modifying child support. *Williams,* 590 S.W.2d at 911; *Glueck,* 913 S.W.2d at 955; *Kocherov,* 775 S.W.2d at 540. In other words, child support awards, like custody and visitation awards, remain subject to modification until the court loses jurisdiction. As a result, we find the child support award in question here is subject to the mandatory language of § 452.345.2 requiring the trial court to order payment of child support to the circuit clerk as trustee on the motion of a party at any time. Thus, on remand we direct the trial court to order the monthly child support due from respondent to appellant to be paid to the Circuit Clerk of Boone County as trustee for appellant, unencumbered by the agreement of the parties allowing respondent certain credits against child support. As to appellant's request for an increase in child support, that issue is not before this court.

On this issue of how child support payments are to be made, we would note that child support orders authorizing payments in lieu of child support should not be favored by trial courts and, in fact, should be condemned, for reasons so clearly illustrated by this case. Here, we have a thirteen-page, single-spaced, written agreement, which, by its author's own admission, was not an "artful piece of legal work" and defies any clear understanding. The purpose of the agreement was to protect the credit record of the respondent. In an attempt to protect respondent's credit record, he was authorized pursuant to the agreement to, in effect, determine his own credits against child support and pay the remaining balance as he determined. Of course, this, by his own admission, resulted in over $7,000 in child support and maintenance arrearages. As a result of this agreement and the interpretation given to it by respondent, the parties' children were forced for a lengthy period of time to do without substantial child support, of which

they would have had the benefit had not this agreement been approved.

■ When it comes to setting the amount and conditions of child support payments, the trial court's primary obligation is to the children to insure that they have the support they need and to which they are entitled under the law. *Williams,* 590 S.W.2d at 911; *Glueck,* 913 S.W.2d at 955; *Kocherov,* 775 S.W.2d at 541. Whether the issue is custody, visitation, or support, the trial court's function is to protect the best interests of the children. And, although the trial court may consider the parents' wishes on these issues, it is not to be a rubber stamp. In this vein, trial courts should resist the temptation of entangling child support in their attempts to effectuate the division and payment of marital debts, and other such attempts, which would rarely, if ever, be in the best interests of the children.

### IV. Attorney's Fees

■ In her fourth point, appellant alleges that the trial court erred in failing to award her attorney fees, which she incurred in bringing the action below.

> Missouri courts have historically adhered to the 'American rule' that, with certain exceptions, litigants bear the expense of their own attorney fees. Ordinarily, any exceptions fit into one of four categories: recovery of fees pursuant to contract, recovery provided by statute, recovery as an item of damage to a wronged party involved in collateral litigation, and, occasionally, reimbursement when ordered by a court of equity to balance benefits.

*Harris v. Desisto,* 932 S.W.2d 435, 448 (Mo. App.1996), citing *Nix v. Nix,* 862 S.W.2d 948, 952 (Mo.App.1993). Appellant contends that she was entitled to an award of attorney fees under the contract exception, in that the terms of the parties' "Amended Separation Agreement," provided for attorney's fees in the case of breach of the agreement, or in the alternative, under the statutory exception of § 452.335.2. We will review the trial court's failure to award attorney fees to appellant for an abuse of discretion. *Leone v. Leone,* 917 S.W.2d 608, 616 (Mo.App.1996). "An

abuse of discretion is established only when the award [or lack of an award] is so 'clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice.'" (Citation omitted). *Id.*

■ As to appellant's claimed contract exception for payment of attorney fees, Paragraph 11 of the parties' "Amended Separation Agreement" provides that:

In the event either party breaches the terms, conditions, promises, or covenants contained herein and the non-breaching party incurs litigation expenses or attorney's fees that are reasonably necessary to effect enforcement of this agreement, the breaching party agrees to be responsible for the non-breaching party's reasonable attorney's fees, litigation expenses and court costs.

The respondent admitted and the trial court found that he had breached the parties' agreement by failing to pay over $7,000 in past-due child support and maintenance. Thus, appellant was entitled to some amount for attorney fees, as well as her litigation expenses and costs as provided for in the parties' agreement. *See Curless v. Farrell,* 924 S.W.2d 314, 317 (Mo.App.1996).

Respondent contends that the trial court did not abuse its discretion in not awarding appellant attorney fees, because her claimed attorney fees were incurred in pursuing all of appellant's claims, not just respondent's breach for failure to pay child support and maintenance, and she failed to delineate what portion of her attorney fees were attributable to this breach. We reject this contention.

"The court is considered to be an expert in necessity, reasonableness and value of [attorney] fees." *Leone,* 917 S.W.2d at 616. The trial court here was certainly in a position to assess some amount for appellant's reasonable attorney fees based on its knowledge of what appellant's attorney had done from the record and personal observations of court proceedings. We find the trial court's award of zero attorney fees to appellant to be "clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice," *id.,* and

reverse and remand for the trial court to determine and award reasonable attorney fees to appellant.

## V. Child Support to Respondent

In her fifth point, appellant alleges that the trial court erred in awarding respondent child support of $135.00 per month, per child, when it changed custody from appellant to respondent. Although we reverse the trial court's judgment as to the change in custody, *supra,* we still must address the matter of child support for the time respondent had custody of the children and was due child support from appellant pursuant to the trial court's decree.

■ Section 452.340.1 RSMo Supp.1996, which governs child support awards, states, in relevant part:

In a proceeding for dissolution of marriage, legal separation or child support, the court *may* order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable or necessary for his support . . . after considering all relevant factors . . . . (emphasis added)

Thus, even when a party does not request child support in the pleadings, the statute authorizes the trial court to enter an order of child support in any proceeding for child support, which would logically include a proceeding on a motion to modify child support, such as appellant filed here. *See In re Marriage of Kovach,* 873 S.W.2d 604 (Mo.App. 1993) (holding that the court could order child support to be paid retroactive pursuant to § 452.340 regardless of whether the party prayed for it in his or her petition). Here, when the trial court transferred custody from appellant to respondent, it was statutorily authorized to determine the amount, if any, appellant should pay to respondent as child support for the children. It was, therefore, not error for the trial court to award child support to respondent from appellant, even though respondent did not specifically plead it in his motion for change of custody.[5]

Point denied.

5. In his counter-motion to modify custody, re-

spondent did pray for "such other orders as are

## VI. Unpaid Medical Expenses

In appellant's sixth and final point, she alleges that the trial court erred in failing to order respondent to reimburse her for one-half of certain medical expenses incurred on behalf of the children. In support of her claim, appellant points to the fact that respondent was required by the terms of the parties' original separation agreement to maintain medical insurance on the children and to be equally responsible for any medical expenses which were not covered by the insurance. In this respect, Paragraph 12 of the original separation agreement provides in pertinent part as follows:

> 12. Husband agrees to maintain medical insurance on the minor children. Any medical, dental, orthodontia or eye care expenses which are not covered by insurance, including any deductible expenses, shall be shared equally between the parties.

In denying appellant's request for reimbursement of medical expenses, the trial court found as follows:

> 8. Respondent/Movant's motion to construe and enforce decree regarding medical expenses (Count IV of Respondent/Movant's motion) is denied as this Court is not satisfied that medical expenses incurred on behalf of the minor children were submitted to Petitioner in time to take advantage of Petitioner/Respondent's medical insurance that Petitioner/Respondent has kept in full force and effect from the date of the original judgment and decree of dissolution.

Thus, the trial court denied reimbursement on the basis that appellant had failed to submit the medical expenses to respondent in time to allow him to submit the same to his insurance carrier for payment. As to this finding, we note that the separation agreement of the parties did not expressly provide that copies of statements or bills for medical expenses had to be submitted for payment to respondent within a certain time frame, or that they had to be submitted to respondent

at all. Thus, logically even if the appellant failed to submit the bills to respondent for payment prior to submitting them in open court, this fact would not defeat her claim for medical expense reimbursement, unless her delay was prejudicial to respondent and such prejudice would defeat her claim as a matter of equity.

On this issue, we find no definitive case law. However, respondent does cite us to the case of *Curless v. Farrell, supra,* which did deal with the denial of a mother's medical expense reimbursement request where she was found to have failed to comply with the parties' separation agreement requiring her to furnish "copies of all bills or other documents evidencing such [medical] expenses." *Curless,* 924 S.W.2d at 317. In this regard, the court held that the trial court did not err in denying the mother the full reimbursement requested, "[b]ecause mother failed to provide father with adequate information to file the claims with his insurer...." *Id.* The court did not articulate the significance to it of the father's being unable to file the insurance claims. However, it can be reasonably inferred that the court believed that the father should not have to reimburse the mother out of his pocket for medical expenses which could have been paid by his insurance carrier if mother had complied with the parties' agreement by submitting the bills for payment. This would be consistent with the requirements of equity. However, there is nothing in the opinion to indicate whether the father, because of the delay in the submission of the bills, was precluded from still filing the claims for payment. Without such evidence, we fail to see how it can be found the father is prejudiced by the mother's delay in submitting the bills for payment until the time of trial.

Here, although not specifically provided for in the parties' agreement, it is only logical to infer that the parties intended by their agreement that bills for medical expenses for the children be submitted to respondent for payment by him or submission to his insurance carrier for payment. Why else would the agreement require respondent to carry

appropriate." Although specificity in pleading is obviously preferred, this could be liberally construed as a prayer for child support. *See Niederkorn v. Niederkorn,* 616 S.W.2d 529, 534 (Mo.

App.1981) (holding that a general prayer for relief in an equitable proceeding, such as a dissolution of marriage, was sufficient to allow the court to award tax exemptions).

medical insurance if it did not contemplate that he would be filing or submitting medical expense statements received from appellant to his insurance carrier for payment? In addition to which, how would respondent be put on notice as to what was the amount of his share of "uncovered expenses," unless appellant was implicitly required by the parties' agreement to submit the expenses to him for payment? Based on this reasoning, we find implicit in the parties' agreement was a requirement that appellant was to submit medical expense statements to respondent for payment. Even if not implicit in the agreement, § 454.603.5(3) requires the trial court to find, *inter alia*, that the "obligee has substantially complied with the terms of the health benefit coverage" before holding the obligor liable for uncovered medical expenses. The question then for us to decide is whether appellant's failure to submit the bills to respondent prior to trial prejudiced respondent in that he cannot now seek payment of the same from his insurance carrier.

Appellant submitted, in court, copies of statements concerning medical expenses she alleged were incurred on behalf of the children for which any uncovered portions respondent was equally liable under the terms of their original separation agreement. At trial, respondent testified that he had never seen the statements, which testimony the trial court was free and, obviously, chose to believe. However, he at no time offered any testimony or evidence to indicate that any part of or all the medical expenses in question were presently precluded from payment if submitted to his insurance company for payment. Thus, the trial court, in finding that appellant's failure to submit the bills to respondent prevented him from taking advantage of his medical insurance made an inferential leap that is not reasonably supported by the record.

Because it is impossible to determine from the record whether respondent was in any way prejudiced by appellant's failure to submit the medical bills prior to trial, it was error for the trial court to deny her claim for medical-expense reimbursement. As such, we reverse and remand the trial court's judg-ment denying appellant's request for reimbursement of medical expenses for the minor children with directions that it hear evidence and determine whether the failure of appellant to submit to respondent the bills for the children's medical expenses prior to trial prevents him from submitting the bills to his insurance carrier, and if so, which expenses should be allowed and disallowed.

### Conclusion

We affirm the judgment of the trial court awarding child support to respondent from appellant. As to all other portions of the judgment, we reverse and remand with the trial court to hear evidence, make findings, and enter its orders consistent with the directives of this opinion.

ELLIS, J., concurs.

HANNA, P.J., concurs in separate concurring opinion.

HANNA, Presiding Judge, concurring.

On the issue of the change of custody, I agree that the majority reached the correct result. I disagree, however, with the majority's order on remand to transfer custody to the mother without further evidence being heard. In spite of the undisputed evidence that the mother left the children without adult supervision from 11:00 P.M. to 7:00 A.M., the majority has ordered custody transferred to the mother without further review. The shortage of evidence before the trial court with regard to the mother's lack of supervision is of concern.[1] Since the majority's opinion on remand directs the trial court to hear additional evidence concerning the father's fitness for visitation, I would also direct the trial court to hear evidence on the lack of supervision issue.

If there is any basis for a change of custody, it must be because of the mother's lack of supervision. As the majority has determined, and I agree, the other charges, standing alone, are not sufficient to constitute a change in circumstances that warrant a change in custody. The evidence consisted of the uncontested fact that the children, ages 15 and 11 at the time in question, were

---

1. The trial transcript covered 105 pages and less than three pages of testimony is devoted to the mother's lack of supervision. Over 80 percent of the testimony concerned the prior agreement and how much money the father owed in back child support.

left without adult supervision from 11:00 P.M. to 7:00 A.M. while the mother worked nights. There was little or no evidence of the maturity level of either child. Most notably, the maturity level of the 15–year–old, who was in charge during her mother's absence, was never raised at trial. Furthermore, other than the mother's hours of employment, there was no other explanation concerning reasons for the lack of adult supervision or what efforts, if any, were made to mitigate the lack of direct supervision. For example, there was no evidence as to whether there were other precautions taken to insure the children's safety; what, if any, guidance, direction, or teaching did the children receive concerning the unsupervised periods; and—consistent with the father's testimony—what dangers, emotional and physical, were the children subjected to because of the area in which they lived.[2] The brief but undisputed evidence raises a substantial concern that should not be ignored, even if the matter was not being remanded for more evidence on the father's fitness for visitation and other matters.

**2.** I am also troubled by the majority's discrediting the father's trial testimony that the children lived in a violent area. As such, the majority's analysis infringes on the trial court's responsibility to judge the credibility of the witnesses and to draw reasonable inferences from the facts presented.